Good morning, your honors. Alexandra Yates on behalf of Tracy Burleigh. And we're asking this court to reverse the district court's denial of the suppression motion and also to vacate three conditions of supervised release. And I'd like to focus today on the suppression issue and specifically on the government's argument that the warrantless entry was justified by exigent circumstances. Your honors, the case law is very clear that the mere presence of drugs in a building is not sufficient to establish an exigency. Officers need specific and articulable facts more than mere speculation or generalization that imminent destruction of the drugs is likely. Now, the officers here first said that they feared the co-defendants might call or text somebody after they'd been pulled over to alert anyone who might be present at the building. Of course, the officers didn't even have specific and articulable facts that anyone was present in the building. They had been surveying it and had not seen anyone come or go except the three individuals they pulled over. How big was this building? The building, your honor, I don't have that at my fingertips. It was in a commercial area. That part I got. It was a large commercial area. And I believe the square footage is stated in the warrant application. Okay. But it was a large commercial building divided into three sections. Okay. There seemed to be a lot of emphasis by the government on the fact that they had pulled over these other individuals. So what happened after that, and what does that do or not do vis-à-vis exigent circumstances? Well, as I understand the government's argument, it created an exigency of sorts because the people pulled over now know that the police are involved and might notify someone back at the building or someone might pass by and see these individuals pulled over and otherwise notify someone at the building. But this is exactly the type of mere speculation, rank speculation, that this Court talked about in Suarez. There were no specific facts that these individuals had or could call or text anybody. In fact, the officers had followed them before pulling them over, didn't indicate that they had seen any of these individuals try to make contact. And once they pulled them over, they specifically seated them to the side of the road so that they could monitor these individuals and make sure that they didn't contact anybody. As to somebody driving by, again, that is just rank speculation that someone might do so and then contact individuals who, again, we don't even know are in the building. Again, after surveying this property, albeit for a limited time, the only people coming and going from the building that the officers had seen were the three individuals who left and locked the door behind them. And then what happens to them? They're detained on the side of the road. I believe that once the warrantless entry is made, they're brought back to the building. I'm not sure where specifically they're detained there. But they're monitored by the officers the entire time. So, in other words, there's no realistic fear that during that interim period they're going to be texting, calling, alerting, running out to tell people to jump ship, that sort of thing? No. Specifically to alleviate that fear, the cops placed these individuals on the side of the road away from their cars so that they could monitor them and make sure that they did not do so. I do also think that it's important to note that what the officers had believed, what the officers believed was inside of this warehouse or commercial building was a large marijuana grow. This is not cocaine that could be flushed down the toilet. In order to dispose of a large marijuana grow, presumably someone would have to haul it out of the building or burn it. And presumably officers who were already surveying the building could monitor the situation. And, of course, they didn't indicate any facts to support that any sort of destruction was occurring. So if your argument prevails that there's no exigent circumstances to enter the building, what then are the legal consequences of that for your client? Yes. Well, certainly the observations that the officers made upon making the warrantless entry, which was that Ms. Burley was trimming the plants, those, and I believe it's under Segura, would be suppressed as an unlawful search. Additionally, because we've argued that once they entered the building, the seizure was an unreasonable amount of time, we would also argue that the search of the building pursuant to the warrant, the evidence that was discovered there, should be suppressed as well. Why? Why? Why? Why? Under the Song Jia Cha case, even though typically a warrant, and, of course, we've argued that the warrant was invalid, but even though typically a valid warrant can purge any earlier taint, under the Song Jia Cha case of this Court, for public policy reasons, when a seizure is Well, Cha was very different, factually. Cha was a house that was seized for over a day. A personal residence where even the residents were not allowed back into the house. That's a public policy that strikes me as very different from the one we're talking about here. I'm not sure why under Segura, the obtaining of the subsequent warrant, if for a moment we assume that there was probable cause for that, doesn't end the question. Well, I would argue that it is applicable. First, in the Murphy case, which we've cited, this Court has said that essentially there's not going to be a distinction between commercial and residential properties when someone is making their home in a commercial property. And additionally, although the length of time to see the Nobody was making a home there. There was somebody staying overnight, but that's not the same as denying someone entrance to their own home for over a day. That's true, Your Honor. But with respect to the length of time, certainly it was less than in Song Jia Cha. But there is no hard and fast rule of the amount of time. Well, how much less? How long are we talking about here? I believe it was an hour and 45 minutes. As compared to how long in Cha? Much longer. Worlds apart. That's true, Your Honor, on a fact-specific level. But the test is whether the officers exercised diligence and whether a warrant and this is under Lindsay, whether the officers could have been expected to get a warrant more quickly. And here, before they even entered the building, in fact, 30 minutes before the officers entered without a warrant, a warrant application had already been prepared. But rather than diligently pursuing that warrant application, the officers unlawfully entered and delayed. Let me step back. If there were no accident circumstances and then they're on the scene, it's during that period that your client makes a statement, is that right? Yes, Your Honor. And that wouldn't be somehow alleviated or superseded by the warrant, correct? That's correct, Your Honor. And then you also said they observed her trimming plants. The warrant doesn't fix that problem, right? Absolutely, Your Honor. So following that on Judge Clifton, if there were no accident circumstances but the delay were not considered to be excessive, then you would be left with a building with whatever was in it pursuant to the search warrant, correct? That's correct. And the government would have the burden of demonstrating inevitable discovery or an independent source. Of course, if we look at the timesheets, which are excerpt of Record 144 in this case, based on the date prior, it's not even clear that Ms. Burley would have still been trimming the marijuana plants. She would have been at the building. She was there to trim the plants for two days, and she had worked the day prior. Additionally, had she not been trimming the plants, she wouldn't have been caught red-handed. That could affect the Miranda analysis and whether she would have given a statement. So I think Your Honor's quite right. I'm just trying to kind of take it step by step to see what would happen. Now, of course, if we found there were exigent circumstances, that kind of busts the thing open from the beginning. I mean, it's like we go down another path with that. But I'm just assuming for talking here as we go each step. So if there are no exigent circumstances but the warrant is not invalid, either in terms of timing or substance, there would still be certain items suppressed, and it would need to go back to the district court to go through another analysis as to your client. Is that right? Yes, Your Honor. And although it could be remanded to the district court to tease out what would be suppressed, I certainly think on the facts present this court could determine that the observations that the officers made when they entered Ms. Burley's statement, those would need to be suppressed. Why would her statement be suppressed? Because it was given before the search warrant came back, and there's no inevitable discovery that she would have given such a statement two hours later. She was seized for an hour and 45 minutes. She might not have even been at the building at the time, and, of course, the burden is on the government to demonstrate an inevitable discovery. And I'd love to reserve the balance of my time. Thank you. Thank you. Good morning, Your Honors. Good morning. May it please the Court, my name is Yvonne Garcia, and I represent the United States. The district court in this case correctly denied defendant suppression motion for three main reasons. First, the search warrant did establish probable cause and served as an independent source separate and apart from any entry in the question of whether there were exigent circumstances, and the evidence was obtained pursuant to the execution of that search warrant. Second, even if this court were to determine that the search warrant was lacking in probable cause in some way, then government submits that it was not. But detectives in the case relied on that warrant in good faith. And finally, defense counsel's focus on the exigent circumstances and the government does argue that there were exigent circumstances present in this case. I do want to focus on the first point, which is that the warrant provided an independent source for the officers to search the premises. Does that cover her testimony or her response? Frankly, I confess I've lost track of the timing. So exactly when did she give her statement in connection with? I know it came after the initial entry. Well, according to the testimony at the suppression hearing of the detective who interviewed her, Detective Gowney, he did mirandize her upon the initial entry, but at excerpts of record, page 100, he specifically stated, I asked for her identification after the search warrant was back. She told me it was by her bed, which was in the back of the building. She was sleeping in an upstairs loft area and she took me back to get her ID. And that's where I interviewed her. So according to his testimony, he interviewed her after the search warrant had already been obtained and probably did so after she had been advised of her Miranda rights and had waived those rights. Can you point me to that in the record just so I can read that? Certainly, Your Honor. It is excerpts of record, page 100. 100, okay. And it is toward the middle of the page, line 14. And I do want to also note for the Court that the affidavit to the search warrant did not include any facts that the officers learned upon the initial entry, did not include any observations. And so the warrant itself was not tainted by anything that the officers did in terms of the initial entry into the premises. If we, for talking purposes, assume that there were no exigent circumstances, would you address the delay? Because the officer basically has the warrant in hand with the affidavit ready to go and get it issued. But he doesn't go get a warrant. Instead, they bust into this place. So there seems to be like a disconnect in this picture. Well, what happened, Your Honor, is that the officers were communicating over radio, and he learned that they had just seen three people leaving, two of whom had backpacks. This is a marijuana grow. These officers are trained narcotics officers who know how these marijuana grows in Santa Barbara County work, and that the people who are running the grows will hire trimmers to package, trim, package, dry out the plants. And when the officers saw two people leaving with backpacks that were capable of containing contraband, at that point, he and his team believed that evidence was being taken away and the possibility that evidence was beginning to be lost to the officers. Marijuana grow operations tend to be larger size than something that can be carried away in a couple of backpacks. Is there really concern that the evidence was all going to be gone? Well, I don't think the officers are required to lose some evidence or risk that in the two hours that it may take to obtain the warrant, that additional evidence will be carved away by other individuals. I'm sorry. Go ahead. But in terms of evidence being taken away, they have the building under surveillance. So if more people come out, I assume they can do, as to those people, what they did with the three who did come out, is to say they can stop them. So they might be concerned about something might happen inside the building to destroy evidence. But the point has now been made a couple of times that we're not talking about something small that can go down a conventional toilet. We're talking about a marijuana grow. That is correct. But I also would like to note the realities of the situation that the officers are facing, which is they have a limited number of team members. Yes, they can continue surveilling each person that leaves the premises and keep officers on the scene, but eventually they're going to reach a point where they don't have enough people to surveil. But you have this warrant. You know what? Under that theory, you would never need to get a warrant because you always might need more people. So that would be a very bad theory for the government. Yes, it seems to me, because we've basically got the Fourth Amendment. But here, you have this guy with the affidavit in hand, and he doesn't go down and get the warrant. And so that really seems to me to be the question, is whether this is an unreasonable delay. I mean, he goes back and talks to these people, and then they go over to the building, and he kind of gets engaged in that, and then he goes and gets the warrant, right? After they've entered the building. I believe that what Detective Brittingham was doing at that point was ensuring that his team had adequate manpower and the adequate resources to make sure that the situation was under control. He went by first the traffic stops, ensured that everything was fine there, then drove directly to the premises and helped secure it. And once the location was secure, that's when he immediately went to the judge to get the warrant signed. So looking back on what happened, now that we have the benefit of hindsight, we can see that perhaps the officers could have had it under control without him. But what he was doing was prudent in terms of the circumstances, making sure that the team is secure and safe and everything is secure, before going and getting the warrant that he had already been diligently preparing as quickly as possible. Assume for a moment, I'm not asking you to concede, but assume for a moment that we were to conclude that exigent circumstances did not exist and therefore the entry and seizure prior to the issuance of the warrant was impermissible. Then the question, one of the questions that shows up is, what do we do with the statements that Ms. Burley makes to the police? And it may be relevant at what point in this sequence we have the warrant, at what point in this sequence we have the statements by Ms. Burley and so on. Do we have any findings of fact by the district court as to the sequence of warrant, statements by Ms. Burley and so on? Unfortunately, no, not in this case. The district court did not make any factual findings. It simply denied the suppression motion and did not actually issue any factual findings or reasons for the denial. I read the part of the transcript where the lawyers are trying very hard to get the judge to say something. As I read the transcript, I suspect what was going on was that the judge had made up his mind earlier and had done, as I'm afraid I do sometimes, I had a data dump and he couldn't remember. He didn't want to go back and bring it back into his head. Well, that raises a question. If we were to determine that there were no exigent circumstances, is this something that needs to go back to the trial court then to then sort out what does that mean? Well, I think it's clear from the record which pieces of evidence came in before the search warrant, which would be the observations that the officers made upon initial entry. Observation of Ms. Burley, for example, actively trimming the marijuana plant, that's something that would not come in. I want to note what was discovered after the search warrant was obtained. First, I do believe that her statements, as noted in the record on page, Exit to Record 100, were made after the warrant was obtained. But what do we do with the fact, let's assume for the moment that we have accurate testimony, and I just read it, that her real statements in an interview don't start until after the warrant's obtained. There's a period between the time of entry, I'm assuming for purposes of the question, again, I don't ask to concede, without exigent circumstances and therefore it's an impermissible entry and seizure. We have a period of, I don't know how long, between the time of their entering, they're observing Ms. Burley, they're at least talking to her initially. Well, she's now been detained until they can get the search warrant. Maybe if they, you know, maybe she could have left. I mean, what do we know about this? It could be entirely that the reason they have her at the time the search warrant is finally issued is only because of the illegal entry. Well, I think the facts support that she would be there. That she would be there? Yes, because Ms. Burley was there for the purpose of trimming the marijuana fence over the course of two to three days, over the weekend. She clearly had in a sort of nook in the commercial space, sleeping bag, some of her belongings for a short stay there at the premises. The purpose of her being there was not social. This wasn't someone's home or she was... Would the government bear that burden if there were no accident circumstances and they're in the building now to determine, you know, whether she's a sort of a fruit of circumstance or whether she might have been in that she would have been there in any event? Is that the government's burden? I believe it would be, Your Honor. So I guess my question is, since we don't have any findings, we have your quite articulate argument, but we don't have any findings. So I'm not quite sure what we as an appellate court can do with that. Do you have any view? Well, in that case, with respect to that limited question of Ms. Burley's statements, I think the court could send it to the district court to have the district court more clearly explain what his factual findings were since the judge did hear the testimony of the officer that day.  I think the record is very clear that because the officers relied on a warrant, even if that warrant, if this court finds that the warrant didn't have probable cause, they relied on it in good faith, everything else, aside from their initial observations, would come in. Am I right in thinking that Burley is now incarcerated? No, she is not. She is serving a supervised release portion of her sentence. I see. So she served the incarceration portion already. Yes. And how much longer does the supervised release last, if you know? Obviously, that's not directly relevant to the issues you've been trying to prepare. I'm afraid I don't know the exact answer. I believe it is a few months, maybe four months. But she had a four-month term of supervised release, so it sounds like there'd be something substantial left. Thank you. Okay. Thank you. We'll give you a minute to rebut since your few seconds won't do much good. Thank you, Your Honor. Ms. Burley will be on supervised release until approximately February of 2014. She was given a four-year term of supervised release. In response to the government's characterization of the facts of when Ms. Burley was questioned, we dispute that characterization. The officer Welch did the questioning. His sworn declaration, which is at Excerpt of Record 130, says that he questioned her quite clearly during the seizure. Although Officer Welch, through questioning of government counsel, started to backtrack a little bit at the hearing, and that's Excerpt of Record 99-100, on cross-examination, he again clarified it was during the seizure. That's Excerpt of Record 101-03. Defense counsel argued to the court that it was during the seizure, and that was at Excerpt of Record 108. The government did not argue the alternative. And, in fact, at an earlier hearing, and this is Excerpt of Record 167, government counsel had represented that Ms. Burley was questioned by Detective Welch during the seizure. In the court, I would also note to this point. Is there a – I mean, he says here, while we were waiting for the signed search warrant, I spoke to Tracy Burley, and then he goes on to talk about the Miranda rights. This is Gowing, I guess it is. Gowing. Do we – would that need to be remanded for the district court to make a factual determination, since there seems to be conflicting evidence? We wouldn't oppose a remand, Your Honor, but I don't believe it's necessary. I would argue that the record's clear, and to the extent the court already made any facts at all, at Excerpt of Record 76, the court said that to the extent the facts were in dispute, it would find the facts in line with the affidavits. And the affidavit here was that Ms. Burley was questioned during the seizure. In response to Judge McEwen's question earlier about whether the burden is on the government to show that Ms. Burley would have been there at a later time, it certainly is. The government offered no evidence in district court to demonstrate that Ms. Burley, the evidence was, was hired to do the trimming for two days. She had done that. Excerpt of Record 144 shows that the trimming generalist – or this trimming, at least the day prior – had stopped at about 8 p.m. Had she been there at all, she may have been sleeping, and of course, that would have been an entirely different circumstance, evidentiary circumstance, than her being present trimming the plants. So we would argue that the government has not met their burden there. And just to close, Your Honor, if there was no – if there was an exigency in this case, I would argue that would mean that any time someone is pulled over on a public street, not a terrible distance, within a mile, I guess in this case, of a drug house, that the Fourth Amendment basically goes out the window, and that can't be the case. The officers need specific and articulable facts, which they did not have here. Thank you. Thank you. Can I ask another question? I'm sorry. I don't want to detain you any longer than necessary. We'll give you your Miranda rights, though. You're free to leave at any time. Thank you, Your Honor. Without any adverse consequence to you or your client. But I have a few more questions. Please. I've lost the page to which your opposing counsel directed me as to the sequence in which we had the search warrant and going to get the I.D. Could you direct me back to that page so I can read it? Yes, Your Honor. I believe the site was Excerpt of Record 100, and it's more fully Excerpt of Record 99 to 100. That's the direct examination by government counsel at the evidentiary hearing of Detective Welsh, which he appears to backtrack a bit from his sworn declaration, and that is at Excerpt of Record 130. But then just a couple of pages later on cross-examination. Wait a minute. On 130, we're talking about Gowan. Gowan. Yeah. So I'm trying to put this together. I think both of these are Gowan. That is to say, I look at page 99, good afternoon, Detective Gowan, good afternoon. So it's Gowan who's talking about when we went back to get the I.D., but it's also Gowan who in the declaration has said, well, while we were waiting for the signed search warrant, I spoke to her. I was holding my notebook, and then she admitted all these things. And then at the end, paragraph 9 on page 131, my interview with Ms. Burleigh lasted between 5 and 10 minutes. So it appears to me that he got all of the damaging information from her during this period while they were waiting for the warrant. And then when we're actually in court, did you ask her, I mean, Detective Gowan is saying two quite different things, one in his sworn declaration and one in his oral statement in court when he's testifying. Yes, and I apologize for the misstatement. And it was Detective Gowan and not Detective Welch. But you're saying that the court said to the extent there, the court went with the affidavits as the controlling fact finding. Is that correct? Yeah. Concededly, the district court was minimal to the extent it made factual findings at all. But the one thing it did state at page 76 was when pressed to give some factual findings by Ms. Burleigh's co-counsel or co-defendant's counsel, the court did say, well, you know, I don't think there were really much facts in dispute here. And to the extent they were in dispute, I would go with the affidavits, something to that effect. So I do believe that the record is sufficiently clear for this court to make the determination that Ms. Burleigh gave. Possibly there were multiple statements. In fact, Detective Brittingham very clearly, and I think I have the correct detective there, very clearly questioned Ms. Burleigh again after returning with the warrant. And it wouldn't make much sense for Detectives Gowing and Detective Brittingham both to be doing that after Detective Brittingham returned with the warrant. So there's a sufficient factual development here for this court to determine that Ms. Burleigh gave an incriminating statement prior to the return with the warrant. Thank you. Thank both of you for your argument this morning. The United States v. Burleigh is submitted. As is United States v. Wilson, United States v. Hernandez-Guerrero, and Yun v. Kaiser. So the final case for argument this morning is specific fuel v. shell oil.
judges: McKeown, W. Fletcher, Clifton, Cjj